**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DIANE E.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 21 C 197** |
| **v.** | ) | |
| | ) | **Magistrate Judge Finnegan** |
| **KILOLO KIJAKAZI, Acting** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Diane E. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a competing motion for summary judgment in support of affirming the ALJ's decision. After careful review of the record and the parties' respective arguments, the Court affirms the Commissioner's decision.

## BACKGROUND

Plaintiff protectively filed for DIB on December 3, 2018, alleging disability since June 21, 2017 due to fibromyalgia, benign joint hypermobility syndrome, and migraines. (R. 142-43, 167). Born in 1975, Plaintiff was almost 43 years old as of the alleged disability onset date making her at all relevant times a younger person (under age 50).

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. She is automatically substituted as the named defendant pursuant to FED. R. CIV. P. 25(d).

20 C.F.R. § 404.1563(c). She graduated from high school, earned a paralegal certificate, and lives in a house with her husband and daughter. (R. 40-41, 168). Plaintiff spent four years working as an investment law paralegal from July 2001 to July 2005. (R. 168). After a several year hiatus, Plaintiff became a judicial assistant in the Waukegan state court in June 2011. (R. 35-37, 168). She was fired on June 21, 2017 due to excessive absenteeism caused by her conditions and has not engaged in any substantial gainful activity since that date. (R. 42-43, 167).

The Social Security Administration denied Plaintiff's application initially on February 7, 2019, and again upon reconsideration on June 3, 2019. (R. 63-82). She filed a timely request for a hearing and appeared before administrative law judge Lovert F. Bassett (the "ALJ") on July 27, 2020. (R. 32). The ALJ heard testimony from Plaintiff, who was represented by counsel, and from vocational expert Susan Entenberg (the "VE"). (R. 34-62). On August 5, 2020, the ALJ found that Plaintiff's hypermobility related arthralgia and fibromyalgia are severe impairments, but that they do not alone or in combination meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 15-18). After reviewing the medical and testimonial evidence, the ALJ concluded that Plaintiff has the residual functional capacity ("RFC") to perform light work with the following restrictions: frequent climbing of stairs and ramps; frequent stooping, crouching, kneeling, and crawling; no climbing of ladders, ropes, or scaffolds; and no exposure to dangerous moving machinery, unprotected heights, loud noises, or vibrations. (R. 18-26).

The ALJ accepted the VE's testimony that a person with Plaintiff's background and this RFC can perform her past relevant work as a "court clerk," and so found Plaintiff not

disabled at any time from the June 21, 2017 alleged disability onset date through the date of the decision. (R. 26-28). The Appeals Council denied Plaintiff's request for review on November 13, 2020. (R. 1-5). That decision stands as the final decision of the Commissioner and is reviewable by this Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005); *Whitney v. Astrue*, 889 F. Supp. 2d 1086, 1088 (N.D. Ill. 2012).

In support of her request for reversal or remand, Plaintiff argues that the ALJ: (1) erred in finding her migraine headaches, anxiety, and depression non-severe and failing to consider those conditions in combination with her other impairments; (2) improperly assessed the limiting effects of her fibromyalgia and hypermobility; and (3) failed to consider evidence that she is limited in her ability to use her hands. As discussed below, this Court finds that the ALJ's decision is supported by substantial evidence.

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by section 405(g) of the Social Security Act (the "SSA"). *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart,* 362 F.3d 995, 1001 (7th Cir. 2004) (internal citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B.    Five-Step Inquiry**

To recover DIB under the SSA, a claimant must establish that she is disabled within the meaning of the Act. *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016). A person is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Crawford v. Astrue*, 633 F.Supp.2d 618, 630 (N.D. Ill. 2009). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner

considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform her past relevant work; and (5) whether the claimant is capable of performing any work in the national economy." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520). If the claimant meets her burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

## C. Analysis

### 1. Migraines and Mental Impairments

In her opening brief, Plaintiff argues that the ALJ committed reversible error at Step 2 of the sequential analysis by finding that her migraine headaches and mental impairments are not severe. (Doc. 15, at 7-9). Plaintiff acknowledges, however, that the Step 2 determination is a *de minimis* screening for groundless claims. (*Id.* at 8) (citing *Meuser v. Colvin*, 838 F.3d 905, 910 (7th Cir. 2016)). "As long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process," making any error of omission at Step 2 harmless. *Esther V. v. Saul*, No. 19 C 8093, 2021 WL 1121123, at *4 (N.D. Ill. Mar. 24, 2021) (quoting *Castile*, 617 F.3d at 926-27). *See also Dorothy B. v. Berryhill*, No. 18 C 50017, 2019 WL 2325998, at *2 (N.D. Ill. May 31, 2019) ("[A]ny error at step two is harmless if the ALJ finds a claimant has *any* severe impairment and goes on to sufficiently address the aggregate effect of all the claimant's severe and non-severe impairments later in his analysis.") (emphasis in original) (citations omitted). Here, the ALJ found that Plaintiff's hypermobility related arthralgia and fibromyalgia are severe impairments and so proceeded through the

next sequential steps. (R. 15-26). In such circumstances, any error the ALJ may have made at Step 2 was at most harmless and does not support remanding the case.

Plaintiff argues that remand is still necessary because the ALJ failed to consider the effects of her migraines and mental impairments on her RFC. This Court disagrees. A claimant's RFC is the maximum work that she can perform despite any limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p. "[T]he responsibility for the RFC assessment belongs to the ALJ, not a physician, [but] an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions." *Anna-Marie L. v. Kijakazi*, No. 21 C 50354, 2022 WL 4610120, at *2 (N.D. Ill. Sept. 30, 2022).

Looking first to Plaintiff's migraines, the ALJ determined that she cannot be exposed to loud noises, vibrations, dangerous moving machinery, or unprotected heights. (R. 18). These are the exact limitations State agency reviewer Richard Bilinsky, M.D., imposed to accommodate Plaintiff's migraines on May 29, 2019. (R. 77). The ALJ found Dr. Bilinsky's opinion "most persuasive" because "it was provided after having obtained sufficient evidence from which to assess the claimant's work-related limitations." (R. 26). Plaintiff does not challenge this aspect of the ALJ's decision or point to any physician of record who found her more limited. With respect to Plaintiff's anxiety and depression, the ALJ found they cause no more than mild limitation in all functional areas with no resulting work restrictions. (R. 16-17). Once again, Plaintiff does not identify any doctor who reached a contrary conclusion. "[C]ourts within this Circuit have repeatedly held that '[t]here is no error' in the formulation of an RFC 'when there is no doctor's opinion contained in the record [that] indicates greater limitations than those found by the ALJ.'"

*Hosea M. v. Saul*, No. 18 C 2926, 2019 WL 5682835, at *7 (N.D. Ill. Nov. 1, 2019) (quoting *Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018)).

The ALJ's RFC assessment is also supported by the medical records. Plaintiff's migraines date back before the June 21, 2017 alleged disability onset date. On November 11, 2016, Plaintiff told neurologist Steven L. Meyers, M.D. that her migraines had increased to two per month, though Excedrin helped. (R. 244, 286). Dr. Meyers instructed Plaintiff to continue taking topiramate and nortriptyline. (*Id.*). Shortly thereafter, on January 23, 2017, Plaintiff sent Dr. Meyers a note stating that the nortriptyline had worked well at first but had become less effective in the prior two weeks. Dr. Meyers increased the dosage to two capsules every night at bedtime. (R. 275). Plaintiff did not complain of headaches again until nearly two years later on October 26, 2018. In a note to Dr. Meyers that day, she reported that her migraines had increased in frequency to a few times per week. (R. 355). When Plaintiff saw Dr. Meyers on November 28, 2018, she reiterated her complaint of twice-weekly headaches but also reported that they had been better recently. (R. 244). Dr. Meyers increased the nortriptyline dosage again, and started Plaintiff on low dose tramadol and Botox. (*Id.*). The last mention of migraine is from Plaintiff's primary care physician Matthew S. Plofsky, M.D. On September 27, 2019, he assessed migraine without aura, without migrainosus, not intractable, and decreased the nortriptyline dosage. (R. 494).

Plaintiff made her first complaint of anxiety on July 26, 2017, telling family medicine specialist Samantha S. Robinson, M.D., that she felt very nervous "pretty much all the time." (R. 21, 272). Dr. Robinson started Plaintiff on paroxetine (R. 273), but she did not like the way it made her feel so she switched to sertraline. (R. 21, 382). At a follow-up

appointment with Dr. Robinson on April 25, 2018, Plaintiff requested and received an increase in sertraline due to some recent stressors and sleeplessness. (R. 21, 260-61). On August 8, 2018, Dr. Plofsky diagnosed Plaintiff with reactive depression and refilled her sertraline prescription. (R. 22, 258-59). Plaintiff did not receive any further treatment for anxiety or depression.

Plaintiff does not explain how these records, which reflect that her migraines, anxiety, and depression were controlled with medication, support greater limitations than those found by the ALJ. Contrary to Plaintiff's suggestion, the mere fact that she was consistently diagnosed with these conditions "does not mean they imposed particular restrictions on her ability to work. . . . It was [Plaintiff]'s burden to establish not just the existence of the conditions, but to provide evidence that they support specific limitations affecting her capacity to work." *Weaver v. Berryhill*, 746 F. App'x 574, 578-79 (7th Cir. 2018). Plaintiff offers nothing but her own subjective reports of brain fog and fatigue, along with speculation that since these are symptoms often associated with headaches and mental impairments, they likely would affect her ability to sustain full-time work. (Doc. 15, at 9-10). The ALJ acknowledged Plaintiff's complaints but found her allegations of associated functional limitations inconsistent with the medical records and her treatment history, which included "no evidence of psychiatric treatment, counseling, or referrals for such treatment or evidence [Plaintiff] specifically sought out mental health services." (R. 16-17). *See Grotts*, *v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022) ("Subjective statements by claimants as to pain or other symptoms are not alone conclusive evidence of disability and must be supported by other objective evidence."). This determination was not patently wrong, particularly absent any medical opinion suggesting Plaintiff was

more limited. *Id.* at 1279; *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support."); *Best*, 730 F. App'x at 382.

Lacking medical support for her complaints of disabling migraine and mental symptoms, Plaintiff suggests the ALJ ran afoul of SSR 19-4p, which addresses the handling of primary headache disorders in assessing RFC. (Doc. 15, at 8). The ruling indicates that a person with a primary headache disorder may experience difficulties concentrating, and Plaintiff faults the ALJ for failing to incorporate such difficulties into the RFC. (*Id.* at 8-9). The flaw in this argument is that no physician of record opined that Plaintiff has problems with attention or concentration. In fact, mental status examinations were routinely normal with no need for specific mental health treatment. (R. 16, 20-25, 256, 266, 277, 284, 352, 512, 524). *Cf. Gerstner v. Berryhill*, 879 F.3d 257, 261-62 (7th Cir. 2018) (ALJ erred in focusing on treating psychiatrist's notations of normal affect and mood while ignoring evidence of anxiety, depression, and problems sleeping and concentrating); *Voigt v. Colvin*, 781 F.3d 871, 878 (7th Cir. 2015) (ALJ improperly concluded the plaintiff's mental problems were solved with medication despite evidence that his mental state remained "disturbed.").

Plaintiff finally objects that the ALJ did not consider the combined effects of her migraines, mental impairments, fibromyalgia, and hypermobility. (Doc. 15, at 10-11; Doc. 22, at 3). More specifically, Plaintiff notes that fibromyalgia can cause brain fog and chronic fatigue, and says that when considered together with her migraines, anxiety, and depression, could result in her being off-task or absent a work-preclusive amount of time. (Doc. 15, at 10-11). Yet no physician of record found that Plaintiff would be off-task or

9

absent for any amount of time. And as noted, no physician found Plaintiff more limited than the ALJ. *Best*, 730 F. App'x at 382. Moreover, the ALJ expressly acknowledged his obligation to consider "all of [Plaintiff's] impairments and all of the records when assessing [her] residual functional capacity" (R. 16), and stated that his RFC accounted for Plaintiff's "combination of impairments, both severe and nonsevere." (R. 25). In such circumstances, the ALJ did not commit reversible error in evaluating the combined effects of Plaintiff's impairments.

"Substantial evidence is not a high hurdle to clear – it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bruno v. Saul*, 817 F. App'x 238, 241 (7th Cir. 2020) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). Viewing the record as a whole, the ALJ fairly considered Plaintiff's migraines and mental impairments in determining the RFC, and that decision is supported by substantial evidence.

### 2. Fibromyalgia and Hypermobility

Plaintiff next argues that the case must be reversed or remanded because the ALJ improperly rejected her subjective complaints of pain associated with her fibromyalgia and hypermobility. In evaluating a claimant's subjective symptom allegations, an ALJ must consider several factors including: the objective medical evidence; the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication; treatment and other measures besides medication taken to relieve pain or other symptoms; and functional limitations due to pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, 7-8 (Oct. 25, 2017). "'An

ALJ need not discuss every detail in the record as it relates to every factor,' but an ALJ may not ignore an entire line of evidence contrary to her ruling." *Benito M. v. Kijakazi*, No. 20 C 5966, 2022 WL 2828741, at *8 (N.D. Ill. July 20, 2022) (quoting *Grotts*, 27 F.4th at 1278). "As long as an ALJ gives specific reasons supported by the record, [the Court] will not overturn a credibility determination unless it is patently wrong." *Grotts*, 27 F.4th at 1279.

Plaintiff testified that she experiences constant pain related to her fibromyalgia and hypermobility related arthralgias. Though she takes prescription medication and medical cannabis, the pain never goes away. (R. 51). Plaintiff estimated that she can walk about two blocks before needing to rest due to pain in her back, legs, hips, and joints. (R. 39). She can stand for about 5 to 7 minutes before her back begins to hurt, and she cannot lift more than 5 pounds due to pain in both shoulders. (R. 39-40). On a typical day, Plaintiff feeds the cats then lays back down and rests because she is "so miserable with pain." (R. 41). If she does go shopping with her husband on a rare occasion, she is "knocked out for the rest of the day sleeping because it just completely exhausts me." (R. 46). Plaintiff believes her condition has been worsening but she does not know why and has not changed her medication regimen. (R. 47, 48).

In discounting Plaintiff's complaints of disabling pain, the ALJ first found her reports inconsistent with the objective medical evidence. (R. 25). The Court finds no error in this assessment. Plaintiff's initial complaints of pain related to abdominal symptoms stemming from her irritable bowel syndrome. (R. 21, 274, 272, 283). On August 30, 2017, Plaintiff told Dr. Robinson that she had been experiencing right hip pain since May as well as some back discomfort. Dr. Robinson prescribed tizanidine for muscle spasms

and Norco for pain, but instructed Plaintiff to use the Norco sparingly and only for severe pain. (R. 21, 268). The following month on September 11, 2017, Plaintiff saw gastroenterologist Monica S. Borkar, M.D. about her abdominal pain. She denied having any joint pains or muscular weakness and received a prescription for Welchol. (R. 21, 265, 267).

Plaintiff first reported aches all over her body during an appointment with family medicine physician Dr. Plofsky on August 8, 2018 (more than a year after the July 21, 2017 alleged disability onset date). (R. 22, 258). Dr. Plofsky documented full range of motion in the neck but positive trigger points on the extremities and trunk. He indicated that Plaintiff may need a rheumatology referral for evaluation of myalgia. (R. 22, 259). At a follow-up appointment on August 24, 2018, Plaintiff requested the referral to a rheumatologist for chronic muscle aching. (R. 22, 256-57). Plaintiff saw rheumatologist Bob H. Sun, M.D., on September 27, 2018 and complained of diffuse pain in her hands, elbows, back, and shoulders. Dr. Sun observed hypermobility along Plaintiff's elbows, wrists, knees, and fingers, and she was able to easily touch the ground with her legs straight. Dr. Sun assessed a Beighton hypermobility score of 9/9 and diagnosed benign hypermobility related arthralgias. (R. 22, 254-55). He referred Plaintiff for genetic testing to rule out Ehlers Danlos syndrome and instructed her to start physical therapy ("PT"). (R. 22, 255).

On November 6, 2018, Plaintiff saw genetic specialist Bradley T. Tinkle, M.D. regarding the multiple joint pains in her back, hands, elbows, and shoulders. Notably, Plaintiff denied have difficulty walking, climbing stairs, dressing, bathing, or doing errands alone. (R. 236). On exam, she had tight trapezius muscles, positive forward spinal

flexion, and hyperextensible elbows, thumbs, and knees, but no decrease in strength or any need for an assistive device. (R. 22-23, 236-37). Dr. Tinkle assessed hypermobility arthralgia and agreed Plaintiff should do PT. He prescribed cyclobenzaprine (a muscle relaxant) to help with the myalgia and Flexeril for muscle spasms. He also diagnosed fibromyalgia, prescribed Lyrica, and recommended that Plaintiff consider medical marijuana. (R. 23, 237-38).

At a follow-up appointment with Dr. Plofsky on January 16, 2019, Plaintiff requested a referral for medical marijuana to assist with her chronic arthralgia pain. (R. 23, 351). Plaintiff returned to Dr. Sun on April 25, 2019 due to constant left shoulder pain that started when she reached back in the car. She also complained of pain in the left thigh for the prior 2 to 3 months. (R. 23, 342). On exam, Plaintiff continued to be hypermobile in the elbows, wrists, knees, and fingers with a Beighton score of 9/9. She also had shoulder tenderness along the deltoid muscle and along the left lateral hip but full strength of 5/5 and full range of motion. (R. 23, 344). An x-ray of Plaintiff's shoulder taken that day was normal, and an x-ray of her hip showed only mild acetabular spurring with no fracture or dislocation. (R. 24, 408, 409). Dr. Sun ordered an MRI of Plaintiff's left shoulder and administered a steroid injection. (R. 24, 345). The May 14, 2019 MRI revealed mild insertional supraspinatus tendinosis, and mild insertional infraspinatus tendinosis with shallow bursal surface fraying but no tear. (R. 24 541).

On June 26, 2019, Plaintiff saw sports medicine specialist Evan Sterling Plowgian, M.D. for left shoulder pain. She reported a 13-year history of intermittent pain that had recently worsened and stopped her from gardening, but also said she walked for exercise. (R. 24, 521, 524). On exam, Plaintiff exhibited mild tenderness to palpation in the

13

shoulder; normal range of motion; full strength of 5/5 but with pain; and 4/5 strength with an empty can test (which tests for supraspinatus tendon tears) with pain. (R. 24, 525). Hawkins and Neers shoulder tests were positive but Plaintiff had no instability and normal sensation. Dr. Plowgian assessed tendinopathy of the left rotator cuff, administered a steroid injection, and referred Plaintiff to PT. (R. 24, 525).

When Plaintiff returned to Dr. Sun on September 16, 2019, she said she had stopped taking Lyrica in July 2019 because it made her feel "dopey." An exam of Plaintiff's shoulder, elbows, wrists, knees, fingers, and hips remained unchanged. (R. 24, 512). Dr. Sun assessed benign hypermobility related arthralgias, referred Plaintiff to the sports medicine specialist for left hip pain, and instructed her to continue with her current medications, including tramadol and Flexeril. (R. 24, 512-13). A hip x-ray taken that day continued to show mild acetabular spurring and minimal pubic symphysis degenerative change. (R. 24, 505). The last available treatment note is from September 27, 2019, when Plaintiff saw Dr. Plofsky to discuss adjusting her medications. (R. 25, 493). She still complained of moderate pain and Dr. Plofsky indicated he would consider adjusting her sertraline dosage to help with fibromyalgia. (R. 25, 494).

Plaintiff fails to explain how any of these records translate into specific functional limitations or support her claims of disabling pain. Based on his review of the record, Dr. Bilinsky concluded on May 29, 2019 that Plaintiff can: occasionally lift and carry up to 20 pounds; frequently lift and carry up to 10 pounds; sit, stand, and walk for about 6 hours in an 8-hour workday; frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; and frequently stoop, kneel, crouch, and crawl. (R. 76-77). The ALJ found Dr. Bilinsky's opinion most persuasive and adopted these exact restrictions into the RFC. (R.

18, 26).  Plaintiff does not identify any physician who found her more limited or challenge the weight given to Dr. Bilinsky's opinion.  *See Underwood v. Saul*, 805 F. App'x 403, 406 (7th Cir. 2020) (arguments not raised before the district court are waived)*.*

Contrary to Plaintiff's suggestion, the ALJ did not reject her statements solely based on the objective evidence.  The ALJ also considered her treatment history, which consisted primarily of medication management and steroid injections that she frequently reported were helpful.  (R. 25, 26).  The ALJ acknowledged Plaintiff's testimony that she was unable to pursue the other recommended treatment protocol (PT) due to a lack of medical insurance.  (R. 25).  But the fact that Plaintiff required only conservative treatment supports the ALJ's conclusion that she is not as limited as she claims.  *Sherry v. Colvin*, No. 13 C 4825, 2016 WL 305358, at *8 (N.D. Ill. Jan. 26, 2016) (a "lack of aggressive treatment for pain despite complaints of disabling pain" is "an entirely valid basis for finding a claimant's testimony not credible.").

Plaintiff challenges the ALJ's observations about the absence of ongoing strength and sensory deficits or muscle atrophy, claiming that these are not symptoms generally associated with fibromyalgia or hypermobility.  (Doc. 15, at 13-14) (citing R. 25).  Given Plaintiff's testimony that she mostly lays in bed and rests all day, however, the ALJ did not commit reversible error in mentioning that Plaintiff routinely presented with full muscle strength and full range of motion.  *See, e.g., Gwendolyn B. v. Saul*, No. 20 C 3244, 2021 WL 1812879, at *8 (N.D. Ill. May 6, 2021) (quoting *Britt v. Berryhill*, 889 F.3d 422, 426 (7th Cir. 2018)) ("[D]iscrepancies between the objective evidence and self-reports may suggest symptom exaggeration.").

Also unavailing is Plaintiff's suggestion that the ALJ failed to adequately consider the effects of her obesity on her functioning. (Doc. 15, at 13). The ALJ expressly discussed Plaintiff's obesity but found it did not result in greater limitations than those set forth in the RFC. (R. 16). For her part, Plaintiff "does not identify any evidence in the record that suggests greater limitations from her obesity than those identified by the ALJ, and neither does she explain how her obesity exacerbated her underlying impairments." *Shumaker v. Colvin*, 632 F. App'x 861, 867 (7th Cir. 2015).

Plaintiff argues that the ALJ made some additional errors, such as noting that she was never in "acute distress" during exams, and indicating that it was "difficult to attribute any alleged degree of limitation in [Plaintiff's] activities of daily living to [her] medical condition, as opposed to other reasons." (R. 26; Doc. 15, at 11, 12). Even assuming that these were not proper reasons for discounting Plaintiff's testimony, the Seventh Circuit has made clear that "[n]ot all of the ALJ's reasons [for disbelieving the plaintiff] must be valid as long as *enough* of them are . . ." *Halsell v. Astrue*, 357 F. App'x 717, 722-23 (7th Cir. 2009) (emphasis in original). Here, the ALJ provided several valid reasons for rejecting Plaintiff's complaints of disabling limitations, and that decision was not patently wrong. *Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, at *10 (N.D. Ill. Apr. 10, 2014) (citing *Schreiber v. Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013)) ("The ALJ's credibility assessment need not be perfect; it just can't be patently wrong.").

### 3.    Hand and Arm Use

Plaintiff finally argues that the ALJ erred in discounting her statements regarding problems using her hands and arms. Plaintiff testified that she has a lot of pain in her shoulders and if she moves the right one even a tiny bit she gets a "shot of pain" from her

shoulder down to her fingers.  (R. 49).  She also has pain in the left shoulder and elbows, and has trouble holding a pen because her fingers stiffen up and she drops things.  (R. 50).  Though her fingers do not go numb, they "kind of straighten out and I drop what I have in my hands."  (R. 48).  Plaintiff estimated that she can write or type for about 5 or 10 minutes before needing to rest for 10 or 15 minutes due to stiffness.  (R. 50).

In discounting this testimony, the ALJ once again began with the objective medical evidence, which he said did not support Plaintiff's allegations of disabling limitations.  First and foremost, Dr. Bilinsky found that Plaintiff can: frequently lift and carry up to 10 pounds; occasionally lift and carry up to 20 pounds; push and pull with the hands and feet up to the same lift/carry weights; and has no manipulative limitations at all.  (R. 76).  The ALJ adopted all of these restrictions in the RFC and Plaintiff does not point to any physician who found her more limited.  *Best*, 730 F. App'x at 382.  The ALJ also considered Plaintiff's conservative course of treatment which was limited to medication and steroid injections.  (R. 25, 26).  Plaintiff may find it "inconceivable" that she would not have greater upper extremity limitations and be capable of performing light work (Doc. 15, at 14), but none of her own treating physicians imposed more restrictions.  As the Seventh Circuit has explained, "[w]e do not reweigh the evidence or substitute our own judgment for that of the ALJ."  *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).  "Rather, it is the role of the ALJ to resolve conflicts in the evidence and to formulate an appropriate RFC based on consideration of the entire record."  *McReynolds v. Berryhill*, 341 F. Supp. 3d 869, 880 (N.D. Ill. 2018).  The ALJ did so here.

## **CONCLUSION**

For reasons stated above, Plaintiff's request to reverse or remand the case is denied and the Commissioner's Motion for Summary Judgment [20] is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated: March 23, 2023

_____
SHEILA FINNEGAN
United States Magistrate Judge

18